498 So.2d 283 (1986)
Linda E. PERRET
v.
Timothy WEBSTER, Johnny McCoy, Acceptance Insurance Company, New Orleans Public Service, Inc., Unknown Bus Driver and Horace Mann Insurance Company.
No. CA-5045.
Court of Appeal of Louisiana, Fourth Circuit.
November 14, 1986.
Rehearing Denied December 10, 1986.
*284 Frank E. Lamothe, III, New Orleans, for appellee.
Floyd F. Greene, New Orleans, for appellantNew Orleans Public Service.
Before GULOTTA, LOBRANO and ARMSTRONG, JJ.
GULOTTA, Judge.
Tortfeasors, New Orleans Public Service, Inc. (NOPSI) and bus driver Glen Kennedy, appeal on liability and quantum ($500,000) from a jury verdict finding NOPSI liable to a plaintiff who suffered severe and disabling injuries in an automobile accident. Plaintiff has also appealed, seeking an increase in her general damage award. Defendant Timothy Webster, the driver of the other vehicle involved in the accident, also appealed but has filed no brief.
Although we otherwise affirm the judgment, we reapportion liability between NOPSI and Timothy Webster and recast the judgment to include the apportionment of fault for the purpose of contribution.[1] We further increase the award to the sum of $897,147.93.

BACKGROUND
On September 10, 1981, plaintiff was proceeding down the center lane of Gen. DeGaulle Drive (DeGaulle), headed toward the Mississippi River bridge. At the intersection of DeGaulle and Sandra Drive (Sandra), defendant Glen Kennedy, the driver of a NOPSI bus, was preparing to make a right turn from the right river bound lane of DeGaulle, the favored street, onto Sandra, the controlled street. Before attempting his turn, Kennedy looked into his side view mirror and then signaled to motorist Timothy Webster, who had stopped at a stop sign located to Kennedy's right on Sandra, to cross the intersection. Webster crossed the first lane of DeGaulle in front of the Kennedy driven bus and proceeded into the middle lane where his car was struck by plaintiff's automobile.
Plaintiff's suit was initially directed against Timothy Webster, Johnny McCoy (the owner of the car which Webster was driving), Acceptance Insurance Company (Johnny McCoy's liability carrier), the "Unknown Bus Driver" (Glen Kennedy), New Orleans Public Service, Inc., and Horace Mann Insurance Company (plaintiff's uninsured motorist carrier). Johnny McCoy, was dismissed on a motion for directed verdict. In response to written interrogatories, the jury found Timothy Webster 10% negligent, NOPSI 90% negligent, and awarded plaintiff $500,000.00. In a November 27, 1984 judgment in consideration of the jury's verdict, the trial judge decreed that Timothy Webster, Acceptance Insurance Company, New Orleans Public Service, Inc. and Glenn Kennedy were liable jointly and in solido to plaintiff for the $500,000.00 amount awarded. It is from this judgment that all parties appeal.

LIABILITY
Appealing, defendants NOSPI and Kennedy contend that because the accident resulted from the joint negligence of Perret and Timothy Webster, plaintiff failed to establish negligence on their part. We disagree.
Plaintiff testified that on the day of the accident she was traveling about 35 mph in *285 a Volkswagen in the middle lane of DeGaulle headed towards the Mississippi River bridge. According to Perret, she was looking directly ahead when the front portion of Webster's vehicle suddenly pulled in front of her. Although plaintiff did not recall the impact, she did remember sounding her horn, and slamming on her brakes as hard as she could. Furthermore, plaintiff also stated that she was aware DeGaulle was the favored street and Sandra the controlled one, and that she did not recall seeing a bus as she approached the intersection.
Timothy Webster testified that he was traveling in a 1974 Oldsmobile 98, on Sandra in the direction of DeGaulle. According to Webster, he had stopped on Sandra pursuant to a stop sign located about 4 to 5 feet from the intersection of Sandra and DeGaulle (at the intersection Sandra is a two-way street divided by a yellow line), in the lane next to the center line. While there, Webster noticed to his left a NOPSI bus stopped on DeGaulle 10 to 15 feet from the corner of DeGaulle and Sandra. After the bus had been stopped about a minute it moved straight toward the witness in the lane of traffic next to the curb. Before attempting to turn onto Sandra, the bus driver, after looking into his side view mirror, stared directly at Webster and motioned with his right hand for him (Webster) to cross DeGaulle. Webster, proceeding about 5 mph, pulled out in front of the bus and without making a second stop entered the center lane of traffic where he saw plaintiff coming. Attempting to keep out of the way of the oncoming vehicle, Webster turned his car away but was unable to avoid the accident.
Kennedy, the bus driver, testified that he had turned right from the right lane of DeGaulle onto Sandra and was straightening out the bus when the collision occurred. Upon hearing the impact, he stopped the bus and went to the scene of the accident. Kennedy further testified that it was against NOPSI policy to wave or signal vehicles in traffic situations, and he denied motioning to Webster to cross in front of the bus or going over the center line of Sandra in executing his turn from DeGaulle. In addition, Kennedy admitted that he had called a dispatcher to report the accident in accordance with company policy but did not make out a report since he was neither involved in the accident nor was the bus hit.
Barbara Harris, a passenger on the NOPSI bus, testified that she was seated on the left side of the bus behind the driver and was able to observe him at all times. According to Harris, the bus stopped for a few minutes at the corner of DeGaulle before turning onto Sandra. While there, the bus driver signaled a "maroon colored car" (the Webster vehicle) to go ahead. This took a few minutes, however, because the driver did not immediately move forward and as a result Kennedy made several more motions with his head and hand signaling to Webster to proceed. When Webster finally pulled out there was a collision. Harris further testified that the bus driver crossed over the center line on Sandra when he turned from DeGaulle onto Sandra and that Kennedy had not straightened the bus when he stopped after the accident. In addition, the witness related that although she was not sure whether she had seen Perret's car prior to the accident, she did remember hearing the screeching of brakes and the impact.
Joseph H. Andre, plaintiff's expert in the field of traffic analysis, investigation and accident reconstruction, testified, based on the measurements of the bus and the traffic lanes, that the bus, proceeding riverbound down DeGaulle in the right hand lane, could not turn onto Sandra without going over the center line on Sandra. However, Andre did admit that if the bus were traveling in the middle lane of DeGaulle or going over the curb it would be able to turn right onto Sandra without crossing the center line.
Jesse J. Hunter, defendant's witness and an employee of NOPSI, testified that the same sized bus could make the turn from DeGaulle onto Sandra without crossing over the yellow line (center line) on Sandra.
*286 Fred Reiser, the investigating police officer, testified that there was no NOPSI bus at the scene of the accident when he arrived. According to Reiser, Webster had related to him that he had stopped on Sandra at the intersection of Sandra and DeGaulle. Whereupon the driver of a NOPSI bus, stopped on DeGaulle at the corner of DeGaulle and Sandra, motioned for him to continue across DeGaulle in order for the bus to turn right. Reiser further stated that DeGaulle is the favored street and Sandra is a stop sign controlled street before intersecting with DeGaulle. In addition, the witness testified that he had issued no citations and that the Webster vehicle had damage to the left front fender and left side.
Considering the evidence, we cannot say the jury erred, based on credibility, in concluding that the accident was caused by the combined negligence of Webster and NOPSI. Accordingly, we find no error in finding liability on the part of Webster, NOPSI, and Kennedy and in exonerating plaintiff.

APPORTIONMENT OF FAULT
A more difficult question is the apportionment of the extent of fault between NOPSI and Webster. Defendants NOPSI and Glen Kennedy contend that should this court affirm liability on the part of NOPSI and Glenn Kennedy, the jury's apportionment of fault, 90% against NOPSI and 10% against Timothy Webster, is clearly wrong. We agree.
Although we agree that the jury correctly found liability on the part of NOPSI and Webster, we disagree as to the apportionment of fault.
Webster testified that after stopping at the stop sign he had proceeded into the intersection only because he had relied solely on the bus driver who had looked into his sideview mirror and signaled to him to come out. Webster further admitted that DeGaulle is a heavily traveled thoroughfare and that he could not see any traffic coming on DeGaulle due to his vision being blocked by the bus.
A motorist approaching a controlled intersection must not only stop in obedience to a stop sign but is required to see approaching vehicles on the favored street and yield to them the right of way. Tillman v. Massey, 445 So.2d 749 (La.App. 4th Cir.1984), writ denied 446 So.2d 743 (La. 1984).
Although the NOPSI bus driver signaled Webster to cross the street, Webster, who was traveling on the controlled street, was not absolved of his duty to look out for approaching vehicles on the favored street and to yield to them the right-of-way.
Furthermore, a duty of "protection" which has been voluntarily assumed must be performed with care. Harris v. Pizza Hut of Louisiana, Inc., 455 So.2d 1364 (La.1984).
In our case, a passenger on the bus corroborated Webster's testimony that Kennedy looked into his sideview mirror and then signaled to Webster that it was safe to cross DeGaulle. Accordingly, the jury had ample basis to conclude that the bus driver voluntarily assumed a duty of protection in regard to Webster.
A trier of fact's findings as to percentages of fault are factual and, in the absence of clear or manifest error, must be upheld on appeal. Fairconetue v. Williams, 482 So.2d 198 (La.App. 4th Cir. 1986). However, where there exists manifest error, we are compelled to adjust those percentages. See Watson v. State Farm Fire and Casualty Insurance Co., 469 So.2d 967 (La.1985) rehearing denied June 27, 1985.
In the instant case, the jury found Webster to be 10% negligent and NOPSI to be 90%. Considering the evidence, we conclude that both parties, Webster and NOPSI, were equally at fault and that the trier of fact was clearly wrong in its apportionment of fault.
We note that in the final judgment, the trial judge did not mention percentages of fault and only held defendants liable to *287 plaintiff "jointly and in solido ". Although the innocent plaintiff is entitled to seek full recovery from any one of the solidary defendants cast in judgment, the apportionment of each judgment debtors' fault determines the amount of contribution owed by the debtors to each other. Accordingly, for the purpose of contribution, we recast the judgment to reflect the tortfeasors' equal percentages of fault. See LSA-C.C. Arts. 1804 and 2324 and Weir v. Gasper, 459 So.2d 655 (La.App. 4th Cir.1984), writ 462 So.2d 650 (La.1985).

QUANTUM
We likewise conclude that the $500,000.00 award is inadequate.
Dr. Lawrence Travis, an ear, nose and throat specialist first saw plaintiff on September 10, 1981 in the emergency room at Jo Ellen Smith Hospital. According to Travis, plaintiff suffered severe respiratory distress as a result of a crushed larynx and had numerous injuries in the head and neck region including facial lacerations involving the eye and forehead area. Perret could not get enough air through her voice box to her lungs to supply her circulatory system with oxygen and as a result was rushed to the operating room where a tracheotomy was performed. In addition, plaintiff was also treated for broken ribs and a contusion to the knee as well as a sprained ankle. Because plaintiff had suffered a severe crush injury of the larnyx, her voice quality, which is low and raspy, will probably not improve for the rest of her life. Moreover, since Perret cannot get a normal amount of air through her throat, she will experience diminishment of exercise capacity and suffer inability to carry out activities of daily living which involve muscular movements. Furthermore, because the voice box is responsible for blocking secretions of food or liquid dropping into the lungs, plaintiff may also have problems with aspiration or the leaking of liquid and solid matter into her lungs. Although plaintiff's airway has largely remained stabilized, this expert still recommended that she be seen at four month intervals for an indefinite period of time. Although Travis has performed six surgeries and two diagnostic laryngoscopies on plaintiff, it is his opinion that plaintiff's condition has worsened.
Dr. Melville J. Reehlmann, an orthopedic surgeon, first saw Perret on September 14, 1981. According to Reehlmann, plaintiff had a grade one sprain requiring the application of a short leg cast which was subsequently removed on October 14, 1981.
Dr. Harold G. Tabb, an ear, nose and throat specialist who first saw plaintiff on April 21, 1982, testified that Perret's air passage going from her mouth down to her lungs is smaller than normal and her voice quality extremely poor and raspy. According to the witness, Perret's limited air passage will probably cause plaintiff to suffer more chest colds and infections.
Dr. John M. Yarborough, a dermatologist who examined Perret about five weeks after her accident, testified that this thirty-four year old divorced woman suffered scarring on the forehead, the bridge of the nose, on the eyelid through the left eye to the cheek, and on her lip. In October, 1981, Perret underwent dermabrasion, a process which involves sanding the surface of the skin. A month after this procedure was performed a second dermabrasion was performed on November 30. In addition to undergoing dermabrasion twice, plaintiff underwent nine injections for skin repair. In Dr. Yarborough's opinion, Perret will probably need two yearly injections to maintain her present condition at a cost of $570.00.
Dr. David L. McNeill, a ophthalmologist, first saw Perret on September 10, 1981. According to McNeill, although plaintiff suffered lacerations to the cranium there was no injury to the eyeball itself. Her eyelid was drawn out of position which resulted in exposure of the eyeball and plaintiff's being unable to close her eye. Perret twice underwent a surgical procedure which kept the eyelid partially closed, and this involved a healing period which was very unpleasant and uncomfortable. When McNeill last saw plaintiff, on April *288 27, 1982, she was still having trouble with complete closure of the eye and experiencing some distortion of the eyelid which would require further treatment.
Dr. Akio Kitahama, a general surgeon, testified that he saw Perret in the emergency room on the date of the accident. According to Kitahama, the damage to Perret's airway was so severe that there was a possibility of her choking to death and as a result an emergency tracheotomy was performed.
The parties stipulated that the total figure of plaintiff's medical bills was $43,805.13.
Cynthia Reeves, the owner of a public relations and marketing firm, testified that plaintiff worked for her. According to Reeves, although Perret was an extremely conscientious worker and exceptionally knowledgeable in the field of public relations, her physical impairments limited her ability to implement a program after she (Perret) had put it together. The witness further related that because Perret's work involves much telephone use, plaintiff's voice problem has frequently resulted in people not understanding her or often hanging up on her thinking she was an obscene phone caller. Furthermore, the witness stated that although she realized Perret's limitations when she hired her, she didn't realize the seriousness of her condition and can use her only to about 30% of capacity. In addition, Reeves stated that Perret's hourly wage is a lot lower because she cannot handle a full range of work.
Henry T. LaRoche, Jr., a personnel consultant, testified that although Perret's work experience has been creative in nature, 60-70% of her job requires the use of oral skills in presenting her creations. In LaRoche's opinion, plaintiff, with her present background, and without her impairment, could earn $25,000 to $28,000 per year in the current market place. Although plaintiff could have qualified for a job with American Automobile Association as a public relations manager, she was not sent there because of her voice impairment. According to LaRoche, plaintiff could probably earn at present $8,000 to $10,000 a year due to her current limitations.
Seymour S. Goodman, a professor of economics, testified that he had conferred with Mr. LaRoche concerning Perret's earning capacity. According to Goodman, plaintiff's lost wages from the date of the accident amounted to $64,609.85 before taxes and $52,216.79 after taxes. Based on a life work expectancy of 17.9 years, the present value of plaintiff's future loss of earning capacity is $211,126.01 after taxes. The total value of plaintiff's lost wages, both past and future, is $304,759.60 before taxes and $263,342.80 after taxes.
Plaintiff testified that after the accident she was sitting in the car experiencing a tremendous amount of pain localized mainly in her head, neck and rib areas. She also stated that while in the intensive care unit of the hospital she was unable to talk, suffered from nausea and vomiting and was "thrashing about" because of extreme pain, thereby, requiring strapping of her arms and legs. Furthermore, plaintiff also related that for the first two weeks after the accident she was unable to talk and had to communicate using a note pad. In addition, she also experienced breathing problems and suffered extreme pain from the suctioning procedures performed on her lungs. Procedures performed on plaintiff, including the use of the insertion of a tube, caused rawness of the nose and throat, and periodic nausea. Perret also experienced a severe amount of discomfort in the chest area caused from her broken ribs, which resulted in her not being allowed to lie flat for six weeks but instead having to sleep in a tilted bed. Prior to her accident Perret had enjoyed singing in the church choir and swimming, but now is unable to do either. Moreover, plaintiff is unable to exercise and has an inability to talk to people in a large group due to her vocal difficulties, and her misshapen eye causes her embarrassment when using contact lenses. Perret finally stated that she experienced difficulty in finding employment because of her voice impediment.
*289 Considering the nature of Perret's injuries, her loss of vocal quality, the numerous painful medical procedures and operations that she has undergone, the special damages and loss of earnings, we conclude that the jury's award of $500,000.00 is inadequate. We increase the award to $897,147.93 as the lowest point that we conclude is reasonably within the jury's discretion. Reck v. Stephens, 373 So.2d 498 (La.1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976), rehearing denied January 21, 1977. Having so concluded, we need not address the issues raised by plaintiff concerning improper jury instructions or the denial of her motion for additur.
Accordingly, IT IS ORDERED that the judgment of the trial court is affirmed insofar as casting judgment in favor of plaintiff and against Timothy Webster, Acceptance Insurance Company, New Orleans Public Service, Inc. and Glenn Kennedy jointly and in solido. However, we amend the judgment to raise plaintiff's award to $897,147.93 and for the purpose of contribution we recast the judgment apportioning liability equally between Timothy Webster and NOPSI.
AMENDED AND AS AMENDED
AFFIRMED.
NOTES
[1] In the jury interrogatories, Timothy Webster was found to be ten percent negligent and New Orleans Public Service, Inc. was found to be ninety percent negligent. In the final judgment, however, the trial judge did not address all of the jury's responses to the interrogatories and only held "defendants, Timothy Webster, Acceptance Insurance Company, New Orleans Public Service, Inc. and Glen Kennedy jointly and in solido" ... to plaintiff without mentioning the apportionment of fault.