(221 P.3d 115)
No. 101,490

ANN G. DOWNING, Administrator of the Estate of Joseph B. Downing, Deceased; and ANN G. DOWNING, Heir-at-Law of Joseph B. Downing, *Appellants*, v. JANET S. KINGSLEY, *Defendant*, and ROBERT W. BULIS, Individually, *Appellee*. ANN G. DOWNING, Administrator of the Estate of Joseph B. Downing, Deceased, *et al.*, *Appellants*, v. UNIFIED SCHOOL DISTRICT NO. 266, *Appellee*.

Opinion filed December 24, 2009.

*Terry J. Torline*, of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, for appellants.

*Stephen E. Robison* and *Lyndon W. Vix*, of Fleeson, Gooing, Coulson & Kitch, L.L.C., of Wichita, for appellees.

Before GREENE, P.J., MALONE, J., and KNUDSON, S.J.

MALONE, J.: Ann G. Downing (Downing), administrator of the estate of Joseph B. Downing, and an heir-at-law, appeals the district court's decision granting summary judgment to Robert W. Bulis and Unified School District No. 266 (U.S.D. 266) following a motor vehicle accident in which Joseph died after colliding with a vehicle driven by Janet S. Kingsley. For the reasons set forth herein, we affirm the district court's judgment.

On the morning of October 25, 2005, Bulis was operating a school bus for U.S.D. 266, and he was traveling north in the inside lane of Ridge Road in Wichita. The school bus came to a stop at the intersection of Ridge Road and 37th Street North in order to make a left turn onto 37th Street North. At that time, a vehicle driven by Kingsley was stopped at the same intersection facing east on 37th Street North. Kingsley's vehicle prevented Bulis from being able to make a wide left turn with the school bus. After a while, Bulis gestured with his hands for Kingsley to cross the intersection so that Bulis could make his turn. After seeing Bulis make the hand gesture, Kingsley proceeded to cross the intersection and collided with Joseph's vehicle which was traveling north in the outside lane of Ridge Road. Joseph died in the collision. Bulis continued to drive the children to school and did not remain at the scene of the accident.

Downing sued Kingsley and Bulis for Joseph's wrongful death, including a claim for damages sustained by his estate. The petition alleged that Bulis "negligently made hand signals to defendant

Kingsley indicating to Kingsley that it was safe to cross the intersection." Downing later filed a petition against U.S.D. 266, contending it was vicariously liable for Bulis' alleged negligence. The two cases were consolidated by agreement of the parties. After completion of discovery, Bulis and U.S.D. 266 filed a joint motion for summary judgment which the district court granted. The district court found that by gesturing to Kingsley, Bulis did not assume a duty to ensure her safe passage across the intersection. The district court concluded that Kingsley had a duty to yield the right-of-way and that her duty could not be delegated to Bulis by reliance upon his hand gesture.

### Summary judgment pleadings

In their joint motion for summary judgment, Bulis and U.S.D. 266 set forth the following statements of uncontroverted facts relevant to the motor vehicle collision:

"1. Defendant Robert W. Bulis began working as a school bus driver for U.S.D. 266 (Maize school district) in the spring of 2005.

"2. On the morning of October 25, 2005, Bulis was driving Bus 25 for U.S.D. 266. After all of the students are picked up, the normal route for Bus 25 is to proceed north on Ridge Road and then west on 37th Street to Maize Middle School.

"3. At the intersection of Ridge Road and 37th, Ridge Road has two northbound lanes and two southbound lanes. As Bulis approached the intersection, he was in the inside (left) northbound lane of Ridge Road so that he could turn left (west) onto 37th Street.

"4. It was approximately 7:00 a.m. when Bulis approached the intersection of Ridge Road and 37th Street and it was dark outside.

"5. As Bulis approached the intersection, he noticed a row of cars stopped at the stop sign on 37th Street facing east. The first vehicle in the row was a white minivan driven by defendant Janet Kingsley and also occupied by her fifth-grade daughter Holly Lewandowski who was ten years old at the time.

"6. It was Kingsley's intention to proceed east on 37th Street across Ridge Road to her home at 6007 West 37th Street.

"7. As she sat at the intersection, Kingsley observed that traffic on Ridge Road was 'mild to moderate' in both directions.

"8. At the intersection, there were cement abutments on either side of 37th Street due to a culvert that ran under the road.

"9. It was Kingsley's habit when traveling east on 37th Street to stop at the stop sign on Ridge Road and then pull ahead a little farther to see past a mound of dirt that partially obstructed the view of traffic on Ridge Road to her right.

"10. On the day in question, Bulis observed that the position of Kingsley's van was such that he could not, with his 40-foot long school bus, execute a left turn that would clear Kingsley's vehicle without striking the cement abutment.

"11. Bulis made a hand gesture directed toward Kingsley. He then slid open the window to his left to get a better view of the cement abutment and gestured again to Kingsley.

"12. According to Bulis, he intended his gesture to indicate to Kingsley that he could not execute his turn, that they were at an impasse and that if she proceeded through the intersection first, he would not hit her.

"13. While sitting at the intersection, Bulis did not check his outside rearview mirror to determine if any traffic was coming up behind him in the outside northbound lane of Ridge Road.

"14. Ten-year-old Holly Lewandowski saw Bulis's gesture and told her mother that the bus driver was waving them across the intersection. Kingsley replied, 'are you sure?'

"15. Kingsley then observed Bulis's gesture and interpreted it as a motion to proceed across the intersection and that it was clear for her to cross.

"16. Kingsley felt she could rely upon Bulis's motion because he was 'high up' and had 'good mirrors.'

"17. Kingsley does not recall making eye contact with Bulis and she did not see him check his mirrors before gesturing to her.

"18. After observing Bulis's gesture, Kingsley looked to the left and then leaned forward and looked to the right, checking for traffic on Ridge Road. Holly Lewandowski saw her mother look each direction twice.

"19. Kingsley looked to her right long enough to satisfy herself that there was no traffic coming from that direction.

"20. Kingsley proceeded east across Ridge Road in front of the bus driven by Bulis and into the path of a Wichita Municipal Transit Authority wheelchair transport bus operated by Joseph B. Downing that was traveling north on Ridge Road in the outside (right) lane.

"21. After the impact, the city bus skidded for a period of time before overturning. Downing ejected from his seat out the folding entry doors and was crushed by the bus."

Downing filed a response to the summary judgment motion, and she attempted to controvert several facts proposed by Bulis and U.S.D. 266. Many of the attempts did not actually controvert the statements but, in fact, either supplemented or expounded on them:

"11. Controverted. Bulis testified during his video-recorded deposition as to the motion he made to Kingsley. According to Bulis's demonstration, he merely shrugged, with both palms facing up, as if to indicate 'what's going to happen?' or 'what are we going to do?' Bulis also testified that he did not believe his hand

was outside the window,when he made that motion. 'You know, the habit is just to put your hand on the window sill.'

"Kingsley demonstrated during her video-recorded deposition the motion made by Bulis. As demonstrated by Kingsley, Bulis moved his left hand and forearm in an upward arc motion, with his left palm facing up. Kingsley testified that Bulis had put his left hand and arm outside the window of the bus when motioning to her.

"At least one of the students aboard the school bus has stated under oath: 'I observed the school bus driver wave to the van by putting his left hand out of the window of the school bus. The school bus driver was waving at the van to go across the intersection.' Sarah Craneck demonstrated on video the motion made by Bulis. As demonstrated by Craneck, Bulis moved his left hand and forearm in an upward arc motion, with his left palm facing up. Other students on the bus reported similar observations.

"12. Controverted. It is uncontroverted that Bulis so testified. But see Response to Paragraph 11 and exhibits cited therein, which show that there is genuine factual dispute as to what Bulis's actions were. Bulis's intent may be implied based on his actions, which are in dispute and must be determined by the finder of fact. In other words, Bulis's self-serving testimony regarding his subjective intent is not conclusive under the facts of this case.

. . . .

"16. Controverted in part. Although it was significant that Bulis was seated high in the bus and it had large mirrors, there were additional reasons that Kingsley relied on Bulis's signaling her to cross the intersection. As Bulis testified in his deposition, the bus he was driving was a '40-foot big behemoth.' It was not possible for Kingsley to see any traffic that was obstructed by the bus. Kingsley's view was further obstructed by the commercial van/truck immediately behind the school bus. 'And because I couldn't see clearly, when the bus driver waved me across, to me, that was like . . . a signal, a crossing signal.' Kingsley also testified that she knew school bus drivers had special training and licensing.

"Finally, Kingsley and Bulis were at an impasse. 'I knew I wasn't going to be going until the bus [i.e., school bus] turned.' And Bulis testified that 'I could see that I wasn't going to be able to turn. . . .'

"17. Controverted in part. Kingsley testified that she did not recall making eye contact with Bulis, but it is unlikely that she did. Bulis could not see inside Kingsley's van, as stated in plaintiffs' response to Paragraph 4, because it was dark outside. Kingsley was able to see Bulis because the lights were on inside the school bus, and could see the 'front side' of his face.

"18. Controverted in part. It is uncontroverted that Kingsley checked for traffic that was in her line of sight. Obviously, Kingsley could not see traffic to the extent her vision was blocked by Bulis's school bus or the vehicles behind it. Kingsley testified: 'I don't think it was possible for me to see' the bus Downing was driving.

"19. Controverted. Kingsley testified that she looked to the right 'long enough to see that it looked clear to me.' "

In her response to the summary judgment motion, Downing also asserted the following additional statements of fact:

"29. Bulis made a statement to police at 4:30 in the afternoon of the day of the accident. According to a transcript of the recorded statement, Bulis said that he '[l]ooked at the van and kind of waved my hands and said ah there's no place I can go I can't turn left. . . . At that point I'm sitting there waiting and . . . I knew there were cars behind me but they were waiting too. . . . And for whatever reason the . . . van shot out there in front of me.'

"30. Bulis made a written statement in which, among other things, he says: 'The white van was blocking the turn I needed to make so I tried to indicate to the driver of the white van that I was at an impasse and that they would need to go first.'

"31. In a statement to EMC Insurance Company on November 10, 2005, Bulis stated, among other things, that after stopping at the 37th Street intersection:

'[W]e were just sitting there, even at that point and still not moving and I'm thinking to myself, well do I go up to 45th—I know I can stay on Ridge and go up to 45th and make the left there, but *I'd already told her she could go* and I'm thinking now if I pull out from—and she hits me I'm gonna be in trouble cause *I'm saying you move forward.*'

"32. Bulis estimated that it was 'probably 10-15 seconds' from the time that he pulled up to the intersection to the time of the accident.

"33. Witnesses to the accident reported that the school bus Bulis was driving obstructed Kingsley's view of Downing's city bus. John Cole stated 'white Chrysler van cross [i]ntersection going east did not see the city van because of school bus.' Similarly, Mike Curtis stated in part that Kingsley 'probably did not see vehicle coming because school bus might have blocked its view.' Russell Atwater reported that a 'service truck' was immediately behind the school bus, also obstructing Kingsley's view."

Bulis and U.S.D. 266 did not attempt to controvert Downing's additional statements of fact.

After hearing arguments of counsel, the district court adopted Bulis' and U.S.D. 266's statements of uncontroverted facts along with Downing's additional statements of fact. The district court granted summary judgment in favor of Bulis and U.S.D. 266. In its conclusions of law, the district court stated:

"In particular, pursuant to the Kansas Supreme Court's decision in *Dawson v. Griffin*, 249 Kan. 115[, 816 P.2d 374] (1991), the Court concludes that by gesturing to Kingsley, Bulis did not assume a duty to insure her safe passage across the intersection. Rather, Kingsley had a duty to yield the right away [sic] and that that duty could [not] be delegated away by reliance upon a hand gesture."

Downing subsequently reached a settlement and dismissed her claim against Kingsley. This appeal follows.

Downing claims the district court erred by granting summary judgment in favor of Bulis and U.S.D. 266. She first contends that the district court erroneously resolved disputed questions of fact in favor of the defendants. Downing also asserts that the district court erroneously applied the law in Kansas regarding the duty of care. Finally, Downing contends that the district court failed to consider whether Restatement (Second) of Torts § 324A (1964) applied to the facts of the case.

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The district court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied if reasonable minds could differ as to the conclusions drawn from the evidence. *Miller v. Westport Ins. Corp.*, 288 Kan. 27, 32, 200 P.3d 419 (2009).

An issue of fact is not genuine unless it has legal controlling force as to the controlling issue. A disputed question of fact which is immaterial to the issue does not preclude summary judgment. If a disputed fact, however resolved, could not affect the judgment, it does not present a genuine issue of material fact. *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000).

Summary judgment should be granted with caution in negligence actions. *Esquivel v. Watters*, 286 Kan. 292, 296, 183 P.3d 847 (2008). However, summary judgment is proper in a negligence action if the only questions presented are questions of law. *Smith v. Kansas Gas Service Co.*, 285 Kan. 33, 39, 169 P.3d 1052 (2007). Finally, a court should be cautious in granting a motion for sum-

mary judgment when resolution of the dispositive issue requires a determination of the state of mind of one or both of the parties. *Brennan v. Kunzle*, 37 Kan. App. 2d 365, 378, 154 P.3d 1094, *rev. denied* 284 Kan. 945 (2007).

In order to establish a negligence claim, the plaintiff must establish the existence of a duty, a breach of that duty, an injury, and proximate cause, which means a causal connection between the duty breached and the injury. *Hale v. Brown*, 287 Kan. 320, 322, 197 P.3d 438 (2008). The general rule is that whether a duty exists is a question of law, but whether the duty has been breached is a question of fact. *Deal v. Bowman*, 286 Kan. 853, 858, 188 P.3d 941 (2008).

### *Were there genuine issues of material facts?*

Downing first contends the district court erred in granting summary judgment because it erroneously resolved disputed questions of fact in favor of Bulis and U.S.D. 266. Downing acknowledges that Bulis testified he only intended his gesture to mean that he would not hit Kingsley if she proceeded through the intersection first. However, Downing claims that Bulis' credibility was placed in issue due to "numerous inconsistent and conflicting statements he provided related to his involvement with this accident." According to Downing, Bulis' credibility issues should have precluded the district court from granting summary judgment in favor of Bulis and U.S.D. 266.

On appeal, Downing provides numerous examples of alleged inconsistent statements made by Bulis. However, there are three problems with Downing's efforts to establish genuine issues of material facts. First, the examples cited by Downing do not generally establish the clear-cut inconsistency in Bulis' story that Downing contends they do. Second, most of the cited testimony does not implicate the material issue in this case; that is, whether Bulis assumed a duty to other drivers on the roadway when he signaled to Kingsley to cross the intersection. Third, many of the examples of alleged disputed facts were not asserted by Downing in district court in response to the summary judgment motion.

For example, Downing cites to two exchanges during Bulis' deposition wherein he is asked about the specific gesture he made to Kingsley:

"Q: . . . At any time did you put your arm out or have your arms in a waving motion to the van driver?
"A: No sir.
    . . . .
"Q: And there's no way you stuck your left arm out the window and made a waving motion to the van driver; is that true?
"A: No. That's true."

Downing also refers to the testimony of Craneck and another student on the bus who claimed that Bulis put his hand outside the window and waved for Kingsley to cross the intersection.

Downing compares this testimony with a written statement Bulis provided after the accident: "I told the officer, in trying to let the driver of the mini van know that I would not be able to turn left until they did something—I did wave my hands in some manner." Downing also refers to a statement Bulis made to an insurance company wherein he admitted that he waved his hand toward Kingsley to cross the intersection.

Downing apparently believes this evidence establishes that Bulis was inconsistent about whether or not he waved his hands at Kingsley. But when the testimony is read carefully, the only disputed fact is whether Bulis put his hands *outside the bus window* when he gestured toward Kingsley. Bulis never denied making some kind of hand gesture directed toward Kingsley. Bulis' and U.S.D. 266's statements of uncontroverted facts clearly acknowledged that "Bulis made a hand gesture directed toward Kingsley. He then slid open the window to his left to get a better view of the cement abutment and gestured again to Kingsley."

Downing also argues that Bulis contradicted himself about whether he looked at the outside rearview mirrors to check for traffic. Bulis testified in his deposition that he did not look at the outside rearview mirrors to see whether traffic was coming. However, in a statement to the insurance company, Bulis indicated: "So I'm looking in the mirror, I'm looking at the—and I think I remember the 2 cars coming from the north up there, I could see

the headlights on there—it's dark, I can see the lights from both directions and there's cars behind me."

Again, a careful reading of the testimony does not necessarily indicate that Bulis was checking his outside rearview mirrors for traffic. He noted that there were two cars coming from the north (the front of the bus) and he was aware there were cars behind him, although it is not clear if he is indicating those cars are directly behind him in his lane or the outside lane. In any event, Paragraph 13 of the statement of uncontroverted facts alleged that Bulis did not check his outside rearview mirror to determine whether any traffic was coming behind him in the outside northbound lane of Ridge Road. In response, Downing merely stated, "Uncontroverted that Bulis so testified." Downing failed to adequately controvert Paragraph 13 of the statement of uncontroverted facts in the summary judgment pleadings.

Next, Downing cites to a phrase in Bulis' statement to the insurance company: "I won't be able to go, so you can go first, everything will be fine." According to Downing, the jury could infer from this statement that when Bulis signaled for Kingsley to proceed, he intended to mean that it was safe for her to cross the intersection. According to Downing, this created a fact issue sufficient to preclude summary judgment in favor of Bulis and U.S.D. 266.

There are two problems with Downing's argument. First, when Bulis' entire statement to the insurance company is read in context, it appears that Bulis was merely indicating to Kingsley that he was unable to proceed and she needed to go first. Bulis never explained what he meant when he said "everything will be fine." Second, and more importantly, Downing did not assert this specific evidence in response to the summary judgment pleadings in order to create a genuine issue of material fact.

Finally, Downing asserts that the fact that Bulis left the scene following the collision is "highly probative of his state of mind at the time of the accident. A jury could reasonably conclude that Bulis left the scene in order to conceal his involvement in causing the accident." Bulis contended he left the scene of the accident

out of concern for the children on the bus and because he did not feel he had any involvement in the collision.

Downing is correct that she is entitled to any reasonable inference to be drawn from the evidence. In some circumstances, a party's flight from the scene may lead to a reasonable inference of consciousness of guilt. But here the issue is whether Bulis assumed a *duty* to other drivers on the roadway when he signaled to Kingsley to cross the intersection. No inference can be drawn that Bulis assumed a duty to other drivers based on the evidence that he left the scene. This evidence does not establish a disputed material fact precluding summary judgment.

In summary, there is no dispute that Bulis made some kind of hand gesture directed toward Kingsley. However, the key to this lawsuit is whether Bulis assumed a duty to other drivers on the roadway when he signaled to Kingsley to cross the intersection. Downing's claims of disputed testimony involve facts that are not material to the existence of a duty. Based upon the summary judgment pleadings, we conclude the district court did not erroneously resolve disputed questions of material fact in granting summary judgment in favor of Bulis and U.S.D. 266.

### Dawson v. Griffin

The district court relied on *Dawson v. Griffin*, 249 Kan. 115, 816 P.2d 374 (1991), to conclude that Bulis did not assume a duty to other drivers on the roadway, including Joseph Downing, when he signaled to Kingsley to cross the intersection. *Dawson* is the seminal "signaling" case in Kansas. Accordingly, a detailed discussion of the facts and the court's analysis in *Dawson* is necessary to resolve Downing's appeal.

Dawson filed a personal injury action against Griffin and American Family Mutual Insurance Company (American Family) arising from an automobile accident between Dawson and Griffin. Dawson named American Family as a defendant because Griffin had claimed that a phantom truck driver motioned for her to turn in front of Dawson, causing or contributing to the collision. The uncontroverted facts established that Griffin was operating her vehicle westbound on Sante Fe Street in Olathe. She stopped her

vehicle at the Chester Street intersection intending to turn left. Dawson was traveling eastbound in the outside lane of Sante Fe. Prior to the collision, a truck was stopped in the inside lane of eastbound Sante Fe at the Chester Street intersection directly facing Griffin. According to Griffin, the driver of the truck motioned for her to turn left in front of him, an offer which she initially declined. Griffin testified that the two drivers made eye contact and the truck driver looked in his rearview and side view mirrors and again motioned for her to go ahead. Griffin turned left in front of the truck and collided with Dawson. The truck left the scene. 249 Kan. at 117.

The trial court granted summary judgment in favor of American Family. The trial court concluded "that the only reasonable inference from the wave by the phantom truck driver to Griffin was 'Go ahead. I'll stay here.'" 249 Kan. at 117. The trial court also found that, as a matter of law, the phantom driver owed no duty of care to Dawson. 249 Kan. at 117.

On appeal, the Kansas Supreme Court began its analysis by noting:

"Dawson relies upon the oft quoted phrase of Justice Cardozo: 'It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.' *Glanzer v. Shepard*, 233 N.Y. 236, 239, 135 N.E. 275 (1922) 23 A.L.R. 1425." 249 Kan. at 118.

The court then analyzed "signaling" cases from other jurisdictions and discovered that "[c]ourts that have recognized a duty have required the plaintiff to show that the signal was intended to mean it was safe to proceed rather than merely an intention to yield the right-of-way out of courtesy." 249 Kan. at 118. The court also noted that in making this determination, some courts "have looked at the signaler's ability to ascertain whether it was safe to proceed." 249 Kan. at 118.

The court next discussed *Perret v. Webster*, 498 So. 2d 283 (La. App. 1986), which Dawson described as his "best case." *Dawson*, 249 Kan. at 118. There, the question of whether the signaling driver assumed a duty to a third person on the roadway was allowed to go to the jury when there was a question of fact regarding

whether the signaling driver was in a position to ascertain whether it was safe to proceed. The court also noted there was independent testimony provided by a passenger in the signaling vehicle that the driver looked in his side view mirror to check for traffic. *Perret*, 498 So. 2d at 285.

The court also reviewed cases cited by American Family, including *Kerfoot v. Waychoff*, 501 So. 2d 588 (Fla. 1987) (signaling driver could not determine the status of other traffic); *Harris v. Kansas City Public Service Co.*, 132 Kan. 715, 297 Pac. 718 (1931) (motorman owed no duty of care to a pedestrian when he was in no better position than she to observe the traffic); *Government Emp. Ins. Co. v. Thompson*, 351 So. 2d 809 (La. App. 1977) (signaling driver's gesture was a courtesy and did not relieve the third driver of his obligation to keep a proper lookout for oncoming traffic); *Van Jura v. Row*, 175 Ohio St. 41, 191 N.E.2d 536 (1963) (statutory obligation to exercise due care to ascertain that a movement can be made with reasonable safety cannot be delegated to another). 249 Kan. at 119-22.

American Family asked the court to adopt the *Van Jura* rationale and cited K.S.A. 8-1527, which requires a vehicle intending to turn left within an intersection to yield the right-of-way to any vehicle approaching from the opposite direction. According to American Family, the statute created a nondelegable duty for a driver to yield the right-of-way to oncoming traffic. 249 Kan. at 122. After reviewing the statute, the court stated: "We agree that the duty imposed by K.S.A. 8-1527 cannot be delegated; however, *Van Jura* is not a persuasive precedent for a total resolution of the instant case." *Dawson*, 249 Kan. at 122.

After discussing the cases from other jurisdictions and K.S.A. 8-1527, the Supreme Court concluded its analysis as follows:

"In the case at bar, there was no verbal communication. In our view, any reliance on the alleged hand wave as a guaranty of safety, in the instant case, was unjustified as a matter of law. Perhaps the trucker meant one thing and Griffin assumed another. We will never know.

"What we do know is this: Griffin had a nondelegable duty to yield to oncoming traffic while making a left turn; and the only reasonable and safe thing to assume from a hand wave is, 'I won't hit you.'

"Other cases will present other facts and in a comparative negligence state, such as ours, each case will necessarily stand or fall on those unique facts. There may be a case where more can be safely understood from a hand wave. This, however, is not such a case." 249 Kan. at 122-23.

### Application of Dawson v. Griffin

Downing contends that *Dawson* is distinguishable from the present case. Downing points out that Kingsley and Bulis were at 90 degree angles whereas in *Dawson*, Griffin and the phantom driver were facing each other. According to Downing, Griffin had the option to simply decline the courtesy of the hand wave from the phantom driver and let him pass by. In the present case, however, Kingsley and Bulis were at an impasse and Bulis could not turn the bus until Kingsley proceeded first. Downing points out that "Bulis had a much better ability to ascertain the traffic in the right lane of Ridge Road than Kingsley did, partly because he was up high and had larger mirrors at his disposal, and his view was not obstructed." Finally, Downing claims that, considering the evidence in the light most favorable to her, a jury could conclude that Bulis' gesture was more than just a courteous hand wave.

Bulis and U.S.D. 266 argue that, like Griffin, Kingsley had a nondelegable duty to yield the right-of-way to Joseph. They cite Wichita City Code 11.36.040(b):

"Except when directed to proceed by a police officer or traffic-control signal, every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop as required in Section 11.36.020, and after having stopped shall yield the right-of-way to any vehicle which has entered the intersection from another highway or which is approaching so closely on said highway as to constitute an immediate hazard during the time when such driver is moving across or within the intersection."

Bulis and U.S.D. 266 also contend that the facts indicating a lack of a duty on the part of the signaling driver are stronger in the present case than in *Dawson*. First, unlike the drivers in *Dawson*, Kingsley and Bulis did not make eye contact and she did not see him check his mirrors. Second, there was no direct evidence from the phantom driver in *Dawson* regarding his intent, but the Supreme Court nevertheless found Griffin's reliance on his hand wave was unreasonable. 249 Kan. at 122. Here, Bulis explicitly

testified he never intended to suggest to Kingsley that the intersection was clear for her to cross; rather, he only intended to convey that he was allowing her to proceed before him.

*Dawson* has not been substantively cited or revisited in Kansas since the decision was issued. Although the court in *Dawson* discussed several cases from other jurisdictions, the court did not rely upon any single case in reaching its decision. The court in *Dawson* held that any reliance by Griffin on the alleged hand wave as a guarantee of safety was unjustified as a matter of law. 249 Kan. at 122. It appears from the court's analysis that Griffin's interpretation of the hand gesture was not a fact issue which precluded summary judgment. As the court simply stated: "Perhaps the trucker meant one thing and Griffin assumed another. We will never know." 249 Kan. at 122. The court focused most on the fact that Griffin had a nondelegable duty to yield to oncoming traffic while making a left turn.

The facts in *Dawson* are substantially similar to the facts in the present case. In both cases, there was no verbal communication between the drivers on the roadway. Also, in both cases, the driver making the hand gesture was in a superior position to observe traffic approaching in the adjacent lane. Contrary to Downing's argument, this factor does not appear to control the issue of whether the signaling driver owes a duty to other drivers on the roadway. In fact, *Dawson* is even a stronger case than this one for imposing a duty on the person making the gesture because in *Dawson* (1) there was eye contact between the drivers, and (2) Griffin actually saw the truck driver check his rearview mirrors for other traffic. Yet in *Dawson* the court determined the phantom driver assumed no duty to other drivers on the roadway when he signaled to Griffin to make a left turn. 249 Kan. at 122.

*Dawson* remains the only word on signaling cases in Kansas. This court is duty bound to follow Kansas Supreme Court precedent, absent some indication the court is departing from its previous position. *Buchanan v. Overly,* 39 Kan. App. 2d 171, 175-76, 178 P.3d 53, *rev. denied* 286 Kan. 1176 (2008). If the signaling driver owed no duty of care to the plaintiff in *Dawson,* we are hardpressed to find that Bulis assumed a duty of care to Joseph Down-

ing when he signaled to Kingsley to cross the intersection. Without the existence of a duty, Downing cannot establish a negligence claim against Bulis and U.S.D. 266. Under the facts of this case, which are substantially similar to the facts in *Dawson*, we conclude the district court did not err by granting summary judgment in favor of Bulis and U.S.D. 266 on the issue of liability.

### Restatement (Second) of Torts § 324A

Finally, Downing argues that the district court erred in not finding that Restatement (Second) of Torts § 324A (1964) applied to the present case. The district court did not address this argument. Restatement (Second) of Torts § 324A (1964) was adopted by Kansas in *Schmeck v. City of Shawnee*, 232 Kan. 11, 24-28, 651 P.2d 585 (1982). This section provides:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

"(a)  his failure to exercise reasonable care increases the risk of such harm, or
"(b)  he has undertaken to perform a duty owed by the other to the third person, or
"(c)  the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A (1964).

Bulis and U.S.D. 266 argue that § 324A cannot be applied to a signaling case without straining the language of the section. They maintain that one motorist's hand signal to another cannot reasonably be regarded as an undertaking "to render services to another." They also argue that such a gesture cannot be transformed into an obligation "for the protection of a third person" as required by the Restatement.

We agree with Bulis and U.S.D. 266 that Restatement (Second) of Torts § 324A is not applicable to the present case. This section of the Restatement has never been applied in Kansas to a signaling case. We note that in *Hoekman v. Nelson*, 614 N.W.2d 821, 824 (S.D. 2000), the Supreme Court of South Dakota rejected a plaintiff's attempt to employ § 324A to impose a legal duty on the part of a signaling motorist. Here, Bulis' hand gesture to Kingsley can-

not reasonably be interpreted as an undertaking "to render services to another . . . as necessary for the protection of a third person." We conclude that Restatement (Second) of Torts § 324A provides no basis upon which to deny summary judgment in favor of Bulis and U.S.D. 266.

## Conclusion

In *Dawson*, the Kansas Supreme Court left the door open for plaintiffs such as Downing by emphasizing that "each case will necessarily stand or fall on [its own] unique facts." 249 Kan. at 122. But the facts in this case are not appreciably different from the facts in *Dawson*. Given our duty to follow current Supreme Court precedent in *Dawson*, we conclude the district court's decision granting summary judgment to Bulis and U.S.D. 266 must be upheld. Perhaps our Supreme Court may see fit to review this case and take the opportunity to reconsider, or at least to clarify, the law in Kansas on this subject.

Affirmed.